UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACQUELINE FISHER,

                                Plaintiff,

        -v-

AETNA LIFE INSURANCE CO.,

                                Defendant.

No. 16-cv-144 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, District Judge:

        Plaintiff Jacqueline Fisher brings this action under the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against Aetna Life Insurance Company ("Aetna" or

"Defendant"), alleging that Aetna failed to honor a group health insurance contract and that certain

provisions of the contract are unenforceable under federal law.  Now before the Court are the parties'

cross-motions for summary judgment.  For the reasons set forth below, Defendant's cross-motion for

summary judgment is denied and Plaintiff's cross-motion for summary judgment is granted in part.

I. BACKGROUND

A.  Facts

        Plaintiff receives health insurance through her husband's law firm, which enrolled in a plan

administered by Aetna (the "Health Insurance Plan" or the "Policy") on January 1, 2015.[1]  (Pl. 56.1 Stmt.

_____

[1] The following facts are drawn from Plaintiff's Local Civil Rule 56.1 Statement (Doc. No. 21 ("Pl. 56.1 Stmt."), Defendant's
Local Civil Rule 56.1 Statement (Doc. No. 26 ("Def. 56.1 Stmt.")), and Plaintiff's Local Civil Rule 56.1 Counter-Statement
(Doc. No. 29 ("Pl. Counter-Stmt.")).  Unless otherwise noted, where only one party's 56.1 Statement or Counter-Statement is
cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects
to inferences drawn from that fact.  In resolving the motions, the Court also considered Plaintiff's memorandum of law in
support of her motion for summary judgment (Doc. No. 17 ("Pl. Mem.")), Defendant's memorandum of law in support of its
motion for summary judgement (Doc. No. 22 ("Def. Mem.")), Plaintiff's reply brief (Doc. No. 27 ("Pl. Reply")), Defendant's
reply brief (Doc. No. 30 ("Def. Reply")), and the documents submitted in support thereof (Doc Nos. 18–20, 23–25, 28–29).

¶¶ 5, 7, 11; Def. 56.1 Stmt. ¶¶ 40, 53.)  The Policy vests discretionary authority to administer the plan and interpret plan terms to the plan administrator, which is also Aetna.[2]  Under the Policy, members participate in a cost-sharing system whereby plan participants pay for medical costs until their payments for covered services reach their annual deductible amount – in this case, $4,000 (*see* Pl. Mem. at 3; Def. Reply at 5 n.7) – at which point Aetna begins to provide coverage (Pl. 56.1 Stmt. ¶ 19).  Once a participant's payments reach their out-of-pocket limit, Aetna provides 100% of the allowed amount for covered services for the remainder of the plan year.[3]  Covered services are defined under the Policy as only those services that are deemed "medically necessary" by Aetna (Def. 56.1 Stmt. ¶ 55), and "medically necessary" is defined in part as "not more costly than an alternative service or sequence of services" that are likely to produce the same results (*id.* ¶ 56).  The Policy states bluntly that Aetna "will not Cover any health service, procedure, treatment, test, device or Prescription Drug that We determine is not Medically Necessary." (Doc. No. 1-2 at 26.)

The Policy also contains a prescription drug coverage section that outlines the participant's responsibility to pay for "higher tier" drugs when a "chemically equivalent Prescription Drug is available on a lower tier."  (Pl. 56.1 Stmt. ¶ 12.)  Unless the higher tier drug is approved by Aetna, the participant must pay the difference between the higher tier and lower tier drugs.  (*Id.*)  This difference in cost between the higher and lower tier drugs, which is typically the difference between a brand-name and generic version of a drug, is called an "additional charge."  (*Id.*)  Aetna may, in its discretion, waive the additional charge if the participant's physician certifies that the name-brand drug is medically necessary for the participant.  (Def. 56.1 Stmt. at 67.)

---

[2] *See* Compl., Doc No. 1-1 at 9060.1 ("We shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein.  We shall be deemed to have properly exercised such authority unless We abuse our discretion by acting arbitrarily and capriciously.").

[3] The parties disagree over whether Plaintiff's out-of-pocket Limit was $6,000, $6,600, or $12,000.  (*See* Pl. Mem. at 4–11; Def. Mem. at 16–19; Pl. Reply at 9–14; Def. Reply at 7–8.)

Sometime before 2015, Plaintiff's doctor prescribed her Effexor® ("Effexor"), which is a Tier 3, name-brand drug used to treat depression.  (Pl. 56.1 Stmt. ¶¶ 14, 23; Pl. Reply at 6.)  The generic equivalent of Effexor is Venlafaxine, which is a Tier 1 drug.  (Pl. 56.1 Stmt. ¶¶ 15–16, 18.)  On January 29, 2014, Plaintiff's doctor submitted a form to Aetna (the "Medical Necessity Request Form") certifying that Effexor was medically necessary for Plaintiff and requesting that Aetna approve coverage for her.  (Doc. No. 28-2.)  On January 30, 2014, Aetna issued a letter (the "Approval Letter") authorizing coverage of Effexor from January 30, 2014 through January 30, 2015 – that is, through the first month of the 2015 policy.  (Doc. No. 28-3.)

Although the parties are engaged in a separate litigation regarding whether Aetna properly reimbursed Plaintiff under the terms of her 2014 plan (*see Fisher v. Aetna*, No. 15-cv-283 (GHW)), there is no dispute that Plaintiff made a purchase of Effexor on January 26, 2015, within the window of the Approval Letter, and that Aetna applied the cost of that purchase to her deductible.  (Doc. No. 18-9.)  Plaintiff continued purchasing Effexor once a month for the rest of 2015, and Aetna continued to apply the cost of her purchases to her deductible in February, March, and April.  (*Id.*)  Beginning on May, 27, 2015, however, Aetna stopped applying the purchases of Effexor to Plaintiff's deductible without explanation, merely indicating on Plaintiff's online account that the purchases were "Not Paid (excluded by plan)."  (*Id.*)  Nevertheless, Plaintiff continued to pay Aetna's contracted price for the Effexor, which is available only for covered prescription drugs.  (Doc. No. 1-2 at 15.)  Ultimately, Aetna did not reimburse Plaintiff for any of her out-of-pocket expenditures on Effexor for 2015.  (Pl. 56.1 Stmt. ¶ 33.)

On October 13, 2015, Plaintiff's husband submitted a first-level appeal of Aetna's denial of benefits on her behalf to Aetna.  (Def. 56.1 Stmt. ¶ 73.)  The appeal consisted of two documents:  a "Member Complaint and Appeal Form" filled out by Plaintiff, and an exhibit with a chronological account of Plaintiff's medical purchases with annotations indicating when Plaintiff believed she satisfied her

deductible and out-of-pocket limit.  Plaintiff's appeal in the Member Complaint and Appeal Form argued, rather cryptically, that for Plaintiff's purchases of Effexor after she purportedly met her deductible but before she met her out-of-pocket limit, "Aetna should have paid the difference between the cost of the generic for Effexor and the $10 copay for the generic," and that for all purchases thereafter, "Aetna should have paid 100% because the individual met her individual out of pocket limit by that time."  (*Id.*)

On November 12, 2015, Aetna sent Plaintiff a letter denying her first-level appeal.  (Doc. No. 19-3 ("Denial Letter").)  In the letter, Aetna merely quoted from the relevant portion of the Policy, indicating that Plaintiff was "responsible for paying the difference between the cost of the brand medication and its generic equivalent" unless Aetna approves coverage of the brand-name drug.  (*Id.* at 3; *see also id.* at 4.)  The letter also stated that Aetna's records indicated that Plaintiff had met her deductible but not her out-of-pocket limit (*id.* at 4), and advised Plaintiff of her right to file a second-level appeal (*id.* at 5).  Plaintiff did not file a second-level appeal.  (Def. 56.1 Stmt. ¶ 77.)

## B.  Procedural History

On January 8, 2016, Plaintiff commenced this action for unpaid benefits pursuant to Section 502(a)(1)(B) of ERISA, which authorizes a plan participant or beneficiary to bring a civil cause of action to recover benefits due under an employee benefit plan.  (Doc. No. 1; *see also Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006) (recognizing that a claim seeking money damages for unpaid benefits under an ERISA-administered plan falls under Section 502(a)(1)(B)).  In her Complaint, Plaintiff asserts that Aetna failed to meet two separate obligations under the Policy.  First, Plaintiff alleges that after she met her deductible on or before May 27, 2015, and before she met her out-of-pocket limit on or before August 31, 2015, Aetna should have paid the difference between the cost of the generic equivalent of Effexor (which was $18.04) and the $10 copayment for a Tier I drug.  (Doc. No. 1 ¶ 26)  Second, Plaintiff

alleges that after she met her out-of-pocket limit for covered services and prescription drugs, Defendant should have reimbursed her for 100% of her purchases of Effexor.  (*Id.*)

On March 7, 2016, Defendant answered the Complaint.  (Doc. No. 15.)  The parties agreed to proceed directly to summary judgment motions without any discovery because the case "only involves questions of law."  (Doc. No. 11 at 1.)  On March 18, 2016, Plaintiff filed her motion for summary judgment (Doc. No. 17), and on April 15, 2016, Defendant filed its opposition and cross-motion for summary judgment (Doc. No. 22).  The motions were fully briefed on May 13, 2016.  (Doc. Nos. 27, 30.)

In their respective motions, the parties submit alternative, potentially dispositive interpretations of the Policy that bear on Aetna's obligation to cover Plaintiff's purchases of Effexor in 2015.  Plaintiff asserts that the plain language of the Policy, coupled with the Approval Letter and testimony from depositions taken in other cases, entitles her to coverage.  Plaintiff further argues that, under the Affordable Care Act, 42 U.S.C. § 18022(c)(3), *et seq.*, her purchases of Effexor should apply toward her out-of-pocket limit and that her out-of-pocket limit should be no more than $6,600.  Defendant argues that Plaintiff's purchases of the brand-name medication instead of the generic was not a covered cost under the Policy and therefore did not count toward her deductible or out-of-pocket limit.  Accordingly, Defendant argues that Plaintiff never met either her deductible or her out-of-pocket limit, and that Aetna was therefore under no obligation to reimburse her for her out-of-pocket expenditures on Effexor.

## II.  LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable factfinder could never accept the nonmoving party's version

of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "On cross-motions for summary judgment, each moving party 'has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor.'" *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-8140 (RPP), 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013) (quoting *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir.1988)).

III. DISCUSSION

A.  Standard of Review and Conflict of Interest

Before turning to the merits of the parties' positions, the Court must first determine the level of deference to afford Aetna's denial of benefits.  "Although generally [a plan] administrator's decision to deny benefits is reviewed *de novo*, where . . . written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, [a court] will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious."  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (internal citations and quotation marks omitted); *accord Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Under this deferential standard, an administrator abuses its discretion where its decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (internal citations and quotation marks omitted).  "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'"  *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).  In addition, the Court must evaluate "whether the decision was based on a consideration of the relevant factors."  *Miller*, 72 F.3d at 1072 (internal citations and quotation marks omitted).  Nevertheless, "[n]otwithstanding the deferential nature of the arbitrary and capricious standard, courts have held that ERISA guarantees that the plan's administrator, the fiduciary, must provide full and fair review of the decision to deny the claim."  *Neely v. Pension Trust Fund of the Pension Hospitalization & Benefit Plan of the Elec. Indus.*, No. 00-cv-2013 (SJ), 2004 WL 2851792, at *8 (E.D.N.Y. Dec. 8, 2004).  In fact,

> review of a determination under th[is] standard is more than a [ ] perfunctory review of the factual record in order to determine whether that record could conceivably support the

decision to terminate benefits. Rather, such a review must include a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary.

*Rappa v. Conn. Gen. Life Ins. Co.*, No. 06-cv-2285 (CBA), 2007 WL 4373949, at *9 (E.D.N.Y. Dec. 11, 2007) (internal quotation marks and citations omitted); *accord Juliano v. The Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000). Review under an arbitrary and capricious standard is limited to the administrative record. *See Miller*, 72 F.3d at 1071.

Plaintiff, while conceding that the Court must review the plan administrator's decision under an arbitrary and capricious standard (Pl. Mem. at 6–7), also contends that Aetna suffers from a conflict of interest under *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) because "Aetna must both determine whether the claim is valid and pay it if Aetna finds it to be valid" (Pl. Mem. at 7 (quoting *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3d Cir. 1987) ("[E]very dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket."))). A conflict of interest analysis under *Glenn* proceeds in two steps. "The initial inquiry is simple: whether the 'plan administrator both evaluates claims for benefits and pays benefits claims.'" *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010) (quoting *Glenn*, 554 U.S. at 112). If so, as is the case here, the court determines "how heavily to weight the conflict of interest thus identified." *Durakovic*, 609 F.3d at 138. Evidence that a conflict affected a decision may bear "on whether a particular decision is arbitrary and capricious." *Id.* at 140. The weight accorded to the conflict of interest will vary depending on the record: the conflict should be accorded greater weight "where circumstances suggest a higher likelihood that [the conflict] affected the benefits decision." *Glenn*, 554 U.S. at 117.

Based on the record available for the Court's review, the Court finds few if any circumstances indicating that the conflict affected Defendant's decision to deny Plaintiff's appeal. First, the administrator is an insurer-administrator, which "typically charges a fee that attempts to account for the cost of claims payouts, with the result that paying an individual claim does not come to the same extent

from the company's own pocket." *Glenn*, 554 U.S. at 114; *see also id.* (noting that insurance companies

may have "a much greater incentive than a self-insuring employer to provide accurate claims processing"

because, *inter alia*, insurance-market competition will punish the insurer for product inferiority, to which

biased claims processing contributes).  Second, Plaintiff points to no evidence suggesting that Defendant

weighed some evidence more heavily than other evidence to its own advantage or has a history of biased

claims administration.  *See Glenn*, 554 U.S. at 117.  And while Plaintiff argues that Aetna's potential

liability, which it estimates to "easily represent[] millions of dollars," "magnifies the significance" of the

conflict (Pl. Mem. at 7), Plaintiff's estimation of potential liability is highly exaggerated and appears to

presume the success of a class certification motion that has not been made and is likely to face considerable

hurdles.  The only circumstance that might allow even a conceivable inference that a conflict of interest

affected the determination of benefits is the apparent procedural inconsistencies in Aetna's calculation of

Plaintiff's benefits:  as explained above, Aetna applied some of Plaintiff's purchases of Effexor to her

deductible and continued to provide Plaintiff with access to Aetna's contracted prices for Effexor, which

are available only for covered services.  *See Glenn*, 554 U.S. at 118 (finding that insurer-administrator's

"inconsistent positions" justified giving more weight to a conflict of interest).  However, there is little

evidence that Aetna's inconsistencies were the result of a conflict of interest, and so the Court accords the

alleged conflict little weight in this matter.

### B.  Aetna's Denial of Benefits was Arbitrary and Capricious

Although it is difficult to tell from the parties' briefs, this dispute basically boils down to whether

and which of Plaintiff's 2015 Effexor purchases were approved as medically necessary.  If the purchases

were approved, then Plaintiff was clearly entitled to reimbursement, though precisely when and how much

is still open to dispute.  If not, then Plaintiff was entitled to no reimbursement, since the payments for

uncovered expenses would not have been applied to Plaintiff's deductible or out-of-pocket expenses.  As

noted above, the Policy expressly provides that Aetna "will not Cover any . . . Prescription Drug that We determine is not Medically Necessary." (Doc. No. 1-2 at 26.) Additionally, the Policy states that the additional charge incurred for unapproved, higher-tier drugs will "not apply towards Your Out-of-Pocket Limit." (Doc. No. 1-2 at 15.)

Unfortunately, the record before the Court offers little insight into Aetna's decision-making process. Thus, while there may have been good reasons for Aetna's denial of coverage, Aetna's response to Plaintiff's appeal did not provide one. That is, instead of explaining why Effexor was not medically necessary, and consequently, not a covered prescription drug, Aetna's letter mechanistically quoted portions of the Policy's Prescription Drug Coverage Section, which merely stated that "You are responsible for paying the full cost (the amount the pharmacy charges You) for any non-Covered Prescription Drug, and Our contracted rates (Our Prescription Drug Cost) will not be available to you." (Denial Letter at 3.) Moreover, the letter confusingly stated that Plaintiff's deductible was met on May 4, 2015, as if her purchases of Effexor *were* a covered service under the Policy (*id.*), while at the same time, Aetna's website indicated that the cost of Plaintiff's purchases of Effexor were "Not Paid (excluded by plan)" beginning with the May 27, 2015 purchase (Doc. No. 18-9). Equally confusing is the fact that Aetna allowed Plaintiff to pay Defendant's contracted price for her purchases of Effexor, again proceeding as if the medication were a covered service under the Policy, even though the Denial Letter quoted portions of the Policy to indicate that those contracted prices were not available to Plaintiff since Effexor was a non-covered prescription drug. (Denial Letter at 3.) Finally, and perhaps most significantly, the letter makes no reference to Plaintiff's Medical Necessity Request Form or the Approval Letter, which Plaintiff argues required Aetna to cover her purchases of Effexor in 2014 and at least in the first month of 2015.

In short, it is unclear what reasons, or even what documents and materials, Aetna relied on when it denied Plaintiff's appeal. More specifically, it is not clear whether Aetna denied Plaintiff's appeal

10

because, for example, the Approval Letter had expired on January 30, 2015 without being renewed, or because Aetna reached a separate determination that the generic was now deemed to be a sufficient alternative to Effexor in all circumstances.  Given the scant justification contained in the Denial Letter, Aetna may have denied Plaintiff's claim for entirely different reasons altogether.  Indeed, Aetna concedes that "it is not clear what facts the plan administrator considered in evaluating Plaintiff's appeal."  (Def. Reply. at 2.)

Given the requirement that Aetna's decision, as plan administrator, be rational and not arbitrary, and that the decision to terminate benefits must be more than just "conceivably" supported by the factual record, *Rappa*, 2007 WL 4373949 at *9, the Court finds that the record does not establish that Aetna's decision "was based on a consideration of the relevant factors."  *Miller*, 72 F.3d at 1072.  Nor is it clear that, in reaching its conclusion, Aetna considered "all of plaintiff's circumstances," *Brown v. Bd. of Trustees of Bldg. Serv. 32B-J Pension Fund*, 392 F. Supp. 2d 434, 445 (E.D.N.Y. 2005), or based its decision on substantial evidence.  Because the Court is unable to determine the basis for Aetna's decision to apply the cost of Plaintiff's purchases of Effexor to her deductible but not to her out-of-pocket limit, or whether that decision was made in error, the Court has little choice but to conclude that Aetna's denial of Plaintiff's appeal was arbitrary and capricious.

On the other hand, Plaintiff's motion for summary judgment and an award of benefits likewise fails.  The law is clear that, even when a court finds that a plan administrator's decision was arbitrary and capricious, it does not substitute its own judgment "but rather will return the claim for reconsideration unless [the court] 'conclude[s] that there is no possible evidence that could support a denial of benefits.'" *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013) (quoting *Miller*, 72 F.3d at 1074).  Here, the Court is not prepared to find that "upon a more complete record a reasonable fiduciary would necessarily have to grant the claim" or that a remand would be a useless formality.  *Miller*, 72 F.3d at

1071. Accordingly, the Court vacates Aetna's denial of benefits and remands to Aetna for reconsideration of Plaintiff's claims.[4]

IV. CONCLUSION

For the reasons stated above, the Court concludes that Defendant's denial of benefits was arbitrary and capricious in that it was not supported by substantial evidence or clear reasons. Accordingly, Defendant's motion for summary judgment is DENIED, and Plaintiff's cross-motion for summary judgment is GRANTED for the limited purpose of remanding Plaintiff's claim for reconsideration by the plan administrator. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 16 and to close this case.

SO ORDERED.

Dated:       March 31, 2017
             New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/17

---

[4] Because the Court remands the case to Aetna for further consideration of Plaintiff's claims, the Court need not reach Plaintiff's additional arguments regarding the validity of the Policy's out-of-pocket limit under the Affordable Care Act, 42 U.S.C. § 18022(c)(1). Indeed, those arguments would likely be mooted were Aetna to reasonably determine that Plaintiff's purchases of Effexor is not a covered service under the Policy.