UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JACQUELINE FISHER,

                Plaintiff,

-v-

AETNA LIFE INSURANCE COMPANY,

                Defendant.

No. 16-cv-144 (RJS)
ORDER

RICHARD J. SULLIVAN, Circuit Judge:

Plaintiff Jacqueline Fisher brings this action, on behalf of herself and others similarly situated, under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against Aetna Life Insurance Company ("Aetna" or "Defendant"), alleging that Aetna breached a group health insurance contract by failing to properly reimburse her for prescription drug expenses. Now before the Court is the parties' second set of cross-motions for summary judgment. For the reasons set forth below, Plaintiff's cross-motion for summary judgment is DENIED, and Defendant's cross-motion for summary judgment is GRANTED.

I. BACKGROUND[1]

A. The Policy

Plaintiff receives health insurance through her husband's law firm, Dunnegan & Scileppi LLC ("D&S"), which, on January 1, 2015, enrolled in a group health plan administered by Aetna

---

[1] The following facts are drawn from Plaintiff's Local Civil Rule 56.1 Statement (Doc. No. 59 ("Pl. 56.1")), Defendant's Local Civil Rule 56.1 Statement (Doc. No. 63 ("Def. 56.1")), and Plaintiff's Rule 56.1 Counter-Statement (Doc. No. 67 ("Pl. Counter-56.1")). Unless otherwise noted, where only one party's Rule 56.1 Statement or Counter-Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In resolving the parties' motions, the Court has also considered Plaintiff's memorandum of law in support of her motion for summary judgment (Doc. No. 55 ("Pl. Mem.")), Defendant's memorandum of law in opposition to Plaintiff's motion for summary judgment and in support of its motion for summary judgment (Doc. No. 61 ("Def. Mem.")), Plaintiff's reply in support of its motion for summary judgment and in opposition to Defendant's motion (Doc. No. 66 ("Pl. Reply")), Defendant's reply in support

(the "Policy"). (Pl. 56.1 ¶¶ 5–7.) The Policy vests discretionary authority to administer the plan and to interpret plan terms with the plan administrator, which is also Aetna. (*See* Doc. No. 1-1 at 9060.) The Policy provides for a three-tiered cost-sharing system. First, plan participants are required to pay for all of their medical costs until their expenses for covered services reach the applicable annual deductible (Doc. No. 1-1 § IV.A), which the parties agree was $4,000 in 2015 (*see* Doc. No. 1-3 § XXVIII; Pl. 56.1 ¶¶ 20, 29). After that, Aetna begins to provide coverage by reimbursing a plan participant for the difference between the cost of covered services and the associated copayment – "the copay differential." (*See* Doc. No. 1-1 § IV.C; Pl. 56.1 ¶ 19.) Finally, after the participant's payments reach the out-of-pocket limit, Aetna pays for 100% of the allowed amount for covered services for the rest of the plan year. (Doc. No. 1-1 § IV.D.) The Policy defines "Covered Services" as those deemed "medically necessary" by Aetna. (Doc. No. 1-1 §§ I, II.B, G.) Aetna makes this decision based on a number of factors, including whether the service is "not more costly than an alternative service or sequence of services, that is at least as likely to produce equivalent therapeutic or diagnostic results." (Doc. No. 1-1 § II.G.)

Separately, the Policy also spells out prescription drug benefits. Under the Policy, *covered* prescription drugs are divided into three tiers, with cheaper, generic drugs generally categorized as "Tier 1" and more expensive, brand-name medications placed into Tiers 2 and 3. (Pl. 56.1 ¶ 12; Doc. No. 1-2 § XIII.C.1.) If a plan participant obtains a covered prescription drug from a higher tier when a "chemically equivalent" drug is available on a lower tier, the participant must pay the difference between "the cost of the [drug] on the higher tier and the cost of the [drug] on the lower tier" unless Aetna approves coverage. (Doc. No. 1-2 § XIII.C.1.) This cost is usually the

---

of its motion for summary judgment (Doc. No. 73 ("Def. Reply")), and the documents and exhibits attached thereto (Doc. Nos. 56–58, 62).

difference between a brand-name and generic drug, and is referred to as an "additional charge." (*Id.*) The Policy states that the "additional charge" will "not apply towards Your Out-of-Pocket Limit." (*Id.*) The subscriber must also make the copayment associated with the lower-tier drug. (*Id.*) However, the plan participant must pay the full cost of any *non*-covered prescription drug. (*Id.*)

B. Plaintiff's Prescription Drug Purchases

At some point before January 29, 2014, Plaintiff's doctor gave her a prescription for Effexor® ("Effexor"), which is a Tier 3 anti-depressant. (Pl. 56.1 ¶¶ 23, 26.) The generic equivalent of Effexor is Venlafaxine, a Tier 1 drug. (*Id.* ¶¶ 15–16.) On January 29, 2014, Plaintiff's doctor sent Aetna a sworn statement that Effexor, rather than Venlafaxine, was medically necessary for Plaintiff. (*Id.* ¶ 23.) Aetna thereafter approved Effexor for the remainder of the 2014 plan year. (*Id.* ¶ 24; Def. 56.1 ¶ 24.) The parties dispute whether the doctor's letter requested Effexor "in place of its generic equivalent" or "certifi[ed] that such a brand-for-generic substitution was medically necessary" (Def. 56.1 ¶ 23), and whether Aetna's approval constituted certification of medical necessity (*id.* at 24; *see* Pl. 56.1 ¶ 24). Plaintiff appears to admit that she did not send another request for the 2015 plan year (*see* Pl. Mem. at 4), and only Plaintiff's 2015 purchases of Effexor are relevant to this case.[2]

On January 26, 2015, Plaintiff purchased Effexor, and Aetna applied the cost of that month's supply to her deductible. (Doc. No. 36 ("Op.") at 3; *see also* Pl. 56.1 ¶ 28.) Plaintiff continued to make monthly purchases of Effexor until at least the end of 2015. (Pl. 56.1 ¶¶ 27, 30, 33.) Aetna applied the full cost of Plaintiff's February, March, and April purchases ($540.11 each

---

[2] Plaintiff was also covered by an Aetna plan purchased by D&S for the year 2014. (*See* Pl. 56.1 ¶ 6.) That policy was the subject of a 2017 bench trial currently pending before Judge Woods. *See Fisher v. Aetna*, No. 15-cv-283 (GHW).

3

time) to her 2015 deductible (*id.* ¶¶ 27–28), and Plaintiff asserts that on May 4, 2015, she met that deductible (*see id.* ¶ 29). However, after May 4, 2015, Aetna did not reimburse Plaintiff for any costs – including the "copay differential" – associated with her monthly prescription; instead, Plaintiff continued to pay the full purchase price of Effexor out of pocket ($540.11 in May 2015 and $590.97 every month thereafter).[3] (*Id.* ¶¶ 30–34.) On August 31, 2015, Plaintiff's purchases of Effexor took her annual medical spending to $6,027.10, which she asserts is above her $6,000 out-of-pocket limit under her policy. (*Id.* ¶¶ 22, 31–32.) However, Aetna did not cover the cost of Plaintiff's Effexor for the rest of 2015. (*Id.* ¶¶ 33–34.)

On October 13, 2015, Plaintiff submitted a first-level appeal of Aetna's denial of benefits on the grounds that (1) "Aetna should have paid the difference between the cost of the generic for Effexor and the $10 copay for the generic" – the copay differential – after she met her deductible and (2) "Aetna should have paid 100% [of post-August 31, 2015 claims] because [she] . . . met her individual out of pocket limit" at that time. (Doc. No. 57-1.) Aetna denied Plaintiff's appeal on November 12, 2015. (Pl. 56.1 ¶ 38.)

C. Procedural History

Plaintiff commenced this action by filing a complaint on January 8, 2016. (*See* Doc. No. 1 (the "Complaint" or "Compl.").) Plaintiff's Complaint raises a claim for breach of contract under Section 502(a)(1)(B) of ERISA for unpaid insurance benefits, and sets out two theories of breach identical to those raised in Plaintiff's first-level appeal. First, Plaintiff alleges that she met her deducible in May of 2015, and therefore Aetna breached the parties' contract when it incorrectly refused to pay Plaintiff "the difference between the cost of the generic equivalent of Effexor . . . and the [generic] copayment" – the copay differential – in connection with prescriptions filled after

---

[3] The parties dispute whether Plaintiff used a coupon to pay $30 for Effexor in December 2015. (*Compare* Pl. 56.1 ¶ 33 *with* Def. 56.1 ¶ 33.) This dispute has no effect on the present motions.

4

she met that deductible. (*See* Compl. ¶ 26(a); Def. Mem. at 19.)  Second, Plaintiff alleges that Aetna did not properly reimburse her for the full cost of her prescriptions filled on September 28, October 29, November 30, and December 31, 2015, and for other medical expenses after August 31, 2015, the date on which Plaintiff asserts that she reached her individual out-of-pocket limit. (*Id.* ¶¶ 18, 26(b).)

The parties filed cross-motions for summary judgment on March 18, 2016 and April 15, 2016, respectively.  (*See* Op. at 5.)  However, in its March 31, 2017 Order, the Court did not address Plaintiff's theories on the merits – instead, it concluded that Aetna's November 12, 2015 decision on Plaintiff's first-level appeal did not properly explain the reasons for Aetna's decision to deny Plaintiff's requested benefits and remanded the matter to Aetna for further consideration. (*Id.* at 12.)  In May 2017, both parties appealed the Court's Order (Doc. Nos. 43, 44), but on March 23, 2018, the Second Circuit dismissed the appeals for lack of jurisdiction (Doc. No. 51).

On remand, Aetna made four determinations that are relevant to this action.  First, Aetna determined that it correctly assessed Plaintiff the additional charge (the difference between the cost of the higher-tier drug and the lower-tier drug) for her February–December 2015 Effexor purchases and correctly required her to make the copayment associated with Effexor's lower-tier, generic equivalent. (Doc. No. 57-6 ("Reexam.") at 3.)  Second, Aetna concluded that Plaintiff's out-of-pocket limit was the amount applicable to her family plan, rather than an individual plan under the Policy. (*Id.*)  Third, the company adhered to its decision that the additional charges associated with Plaintiff's Effexor prescriptions should not be "applied to [her] out-of-pocket limit." (*Id.*)  Finally, Aetna reversed its decision not to reimburse Plaintiff for the copay differential – here, the difference between the cost of the generic drug ($18.04 per month) and the copayment associated with that drug ($10 per month), totaling $8.04 a month.  (*Id.* at 2–3.)

5

Specifically, Aetna determined that its decision to apply Plaintiff's January, February, March, and April additional charges – the difference between Effexor's cost and the generic drug's cost – to her deductible was incorrect and constituted an unwarranted windfall to Plaintiff. (*Id.* at 3; *see also* Op. at 10.) Aetna nevertheless decided *not* to "revise the calculation of [her] deductible." (Reexam. at 3.) Thus, recognizing for purposes of this case that Plaintiff's deductible had been satisfied in May 2015 due to its own error, Aetna overturned its prior decision to deny Plaintiff reimbursement of the copay differential and "issu[ed] reimbursement in the amount of $64.32 [for the period between May and December 2015] for the incorrect copay that was originally applied." (*Id.* at 5.) On April 30, 2018, Aetna mailed a check for $64.32 to Plaintiff's attorney, and did so again on May 1, 2018. (Doc. No. 76 ¶¶ 5, 7.) Although Plaintiff agrees that she is entitled to the $64.32, her attorney returned both checks without depositing them. (*Id.* ¶¶ 6, 8.)

On April 16, 2018, Plaintiff filed the instant motion for summary judgment, arguing that (1) her prescription for Effexor was medically necessary and should have been covered; (2) she is entitled to a judgment of $64.32; and (3) she is entitled to all amounts she spent in excess of the applicable out-of-pocket limit, which she contends totals $2,304.12. (Pl. Mem. at 2.) Aetna filed a cross-motion for summary judgment on April 30, 2018, seeking dismissal of Plaintiff's claims. (Doc. No. 60.) The motions were fully briefed as of May 14, 2018 (Doc. Nos. 66, 73), and Plaintiff filed a supplemental declaration on May 30, 2018 (Doc. No. 76).

## II. LEGAL STANDARD

### A. Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed

6

facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "show[s] – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted).

7

### B. ERISA Standard of Review

The parties now agree that that the plan administrator's decisions must be reviewed under an abuse of discretion standard. Under this standard, courts "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (internal quotation marks omitted). Accordingly, an administrator's decisions are subject to reversal only if they are "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (internal quotation marks omitted).

### III. DISCUSSION

As noted above, Plaintiff makes two requests for damages. First, Plaintiff seeks the amount she spent in excess of the individual out-of-pocket limit. Second, Plaintiff claims she is entitled to the copay differential. The Court will address each of Plaintiff's damages requests in turn.

### A. Out-of-Pocket Limit

Plaintiff asserts that she is entitled to reimbursement of the amounts she spent above her out-of-pocket limit. Although the parties agree that the Policy provides for payment of all covered expenses after the participant's payments exceed the out-of-pocket limit, they disagree as to what that limit was and whether Plaintiff met it. The Policy provides that in 2015, the applicable individual out-of-pocket limit was $6,000 and that the family limit was twice that – $12,000.[4]

Part IV.D of the Policy provides:

> When You have met Your Out-of-Pocket Limit in payment of Copayments, Deductibles, and Coinsurance for a Plan Year in the Schedule of Benefits section

---

[4] In their papers, the parties at times refer to a $6,600 individual limit and a $13,200 family limit. (*See* Def. Mem. at 21; Pl. Reply at 10.) Those limits are the maximums permitted pursuant to regulations promulgated by the Department of Health and Human Services. *See Patient Protection & Affordable Care Act; Exchange & Insurance Market Standards for 2015 and Beyond* (*Exchange & Insurance Market Standards*), 79 Fed. Reg. 30240, 30313 (May 27, 2014). However, the HHS regulations set the ceiling, not the floor, for out-of-pocket expenses. Accordingly, the Court will apply the lower limits set forth in the Policy. In any event, whether the Policy limits or the higher limits set out in the regulations apply is not material to this dispute.

of this Certificate, We will provide coverage for 100% of the Allowed Amount for Covered Services for the remainder of that Plan Year. If other than individual coverage applies, when persons in the same family covered under this Certificate have collectively met the family Out-of-Pocket Limit in payment of Copayments, Deductibles, and Coinsurance for a Plan Year in the Schedule of Benefits section of this Certificate, We will provide coverage for 100% of the Allowed Amount for the rest of that Plan Year.

(Doc. No. 1-1 § IV.D.) Based on this language, Plaintiff believes that the first sentence is controlling, and that "You" and "Your" refer to her individually, thereby triggering the individual out-of-pocket limit. Aetna, on the other hand, argues that the second sentence directs that the family out-of-pocket limit applies, and that under that provision, Aetna's duty to cover all of Plaintiff's health expenses arose only when her family, taken together, met the $12,000 cap.

Aetna is clearly correct here based on the language of the contract. As Aetna points out, the second sentence of Section IV.D of the Policy provides specifically that "[i]f other than individual coverage" – that is, family coverage – "applies," the out-of-pocket limit is met when the *family* limit is "collectively" satisfied by the family's medical expenses. The parties agree that Plaintiff, the spouse of a D&S partner, was covered as a family member under D&S's group policy. (*See* Pl. 56.1 ¶ 8; *see also* Doc. No. 1-1 § V.B.) The family limit is therefore applicable to Plaintiff's reimbursement requests. *See Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.").

Section IV.A, which sets out the deductible applicable to family policies, supports this plain meaning. That section reads in part: "If You have other than individual coverage, You must pay the family Deductible in the Schedule of Benefits section of this Certificate for Covered in-network services under this Certificate during each Plan Year before We provide coverage for any person covered under this certificate." (Doc. No. 1-1 § IV.A.) Plaintiff has already admitted that Section IV.A instructs that the family deductible applies (*see* Pl. 56.1 ¶ 20, 29), and Section IV.D

9

is not different enough to justify a contrary reading. Both Section IV.D and Section IV.A set out the rule applicable to participants who have "other than individual coverage," both require the participant to follow the relevant "family" expense caps, and both instruct that the relevant limit is met when the family collectively meets that family cap.

Notwithstanding the clear language of the Policy, Plaintiff alternatively argues that 42 U.S.C. § 18022(c)(1)(B), which post-dates the Policy and limits the amount of "cost-sharing" a health care insurer may demand of its subscribers, requires Aetna to apply the lower, individual limits. The statute defines "cost-sharing" as "deductibles, coinsurance, copayments, or other similar charges" and "any other expenditure which is a qualified medical expense . . . with respect to essential health benefits covered under the plan," but not "spending for non-covered services." 42 U.S.C. § 18022(c)(3)(A), (B). The statute then (1) caps the amount that a health insurer may require its "self-only" subscribers to pay in cost-sharing, (2) caps family out-of-pocket spending at twice the individual amount, and (3) indexes the amount to the rate of medical inflation. *Id.* § 18022(c)(1)(B), (c)(4).

Concerned that some consumers were confused by the very issue that Plaintiff now highlights – "the applicability of the annual limitation of cost-sharing in other than self-only plans" – on February 27, 2015, the Department of Health and Human Services ("HHS") determined that "[t]he annual limitation on cost sharing for self-only coverage applies to all individuals regardless of whether the individual is covered by a self-only plan or is covered by a plan that is other than self-only." *Patient Protection & Affordable Care Act; HHS Notice of Benefit & Payment Parameters for 2016*, 80 Fed. Reg. 10750, 10824–25 (Feb. 27, 2015) (noting that under the new regulation, "family high deductible health plan[s] cannot require an individual in the family plan to exceed the annual limitation on cost-sharing for self-only coverage"). Indeed, this framework

is consistent with Plaintiff's reading of the Policy, since it provides that the out-of-pocket limit for an individual covered under a family plan is met at the earlier of either when (1) the family's cost-sharing expenditures meet the family limit *or* (2) the individual beneficiary's cost-sharing expenditures hit the individual cap.

However, this clarifying regulation is of no use to Plaintiff, since HHS, perhaps recognizing that many 2015 plans had already taken effect by February 27, 2015, provided in its regulation that it would only apply *prospectively*. *See* 80 Fed. Reg. at 10825 ("We note that 2016 plans must comply with this policy."); *see Barenboim v. Starbucks Corp.*, 698 F.3d 104, 113 (2d Cir. 2012) (suggesting that a regulation would "raise a retroactivity concern" where it "attach[ed] new penalties or other legal consequences to actions preceding [its] promulgation"). Since HHS made clear that its regulation applied only in the future, this regulation is not relevant to the dispute over the terms of Plaintiff's 2015 policy. Accordingly, the clear language of the policy – and therefore the $12,000 family out-of-pocket limit – applies.

This conclusion is fatal to Plaintiff's claim, since Plaintiff's family only spent $10,120.95 on cost-sharing expenditures in 2015. (Doc. No. 23-4; *see also* Def. 56.1 ¶ 89.) Therefore, regardless of whether Plaintiff's Effexor prescription was medically necessary in 2015, Plaintiff's family did not hit its out-of-pocket limit of $12,000 in that year, and Aetna's duty to reimburse Plaintiff for spending in excess of the limit was never triggered. Plaintiff's claim must therefore be dismissed.

### B. Copay Differential

Plaintiff also argues that she is entitled to a money judgment of $64.32, the total amount of the copay differential. (*See* Pl. Mem. at 7.) After determining on remand that Aetna's application of the additional charge to Plaintiff's deductible resulted in an error heavily in Plaintiff's favor, Aetna does not dispute that it has agreed to pay Plaintiff that amount. (Def. Mem.

at 19.) Thus, though Plaintiff has not in fact cashed the checks sent to her, she has been given the exact relief she requested in her complaint.[5] (*See* Compl. ¶ 26(a).)

The deferential standard under ERISA precludes a judgment in favor of Plaintiff on this claim. On remand, Aetna explained that it had incorrectly applied the "additional charge" Plaintiff paid – the difference between Effexor and the generic drug – to Plaintiff's deductible, resulting in satisfaction of the deductible in May 2015. (Reexam. at 3.) Generally, an additional charge is not medically necessary unless approved, and thus not a covered expense applicable to the deductible. (*See* Op. at 9.) This resulted in a windfall to Plaintiff; nevertheless, Aetna explained that it did not intend to reverse this error. (Reexam at 3.) Based on this decision, it agreed to pay the copay differential of $64.32, which Plaintiff does not appear to allege is arbitrary and capricious. (*See* Pl. Mem. at 8 (asking the Court to enter a "non-final judgment" for $64.32 so that Plaintiff may later seek to certify a class).) Nor could she, since a benefits determination that the parties agree correctly construes the policy – even if, as here, the deductible was reached sooner than it should have been due to a prior error made in Plaintiff's favor – cannot, by definition, be arbitrary and capricious. *See, e.g., Caunitz v. IBM Corp.*, No. 15-cv-9281 (VB), 2016 WL 6956631, at *3 (S.D.N.Y. Nov. 28, 2016) ("Therefore, the Plan Administrator's decision was not only not arbitrary or capricious, it was a correct interpretation of the Plan."); *Zito v. SBC Pension Benefit Plan*, No. Civ.A 3:02-cv-277 (JCH), 2005 WL 486748, at *4 (D. Conn. Mar. 1, 2005) ("Accordingly the Committee's decision was neither arbitrary nor capricious in light of the plain terms of the Plan; indeed, it was correct."). Accordingly, Plaintiff is not entitled to a judgment

---

[5] The record reflects that Plaintiff received two checks for $64.32 each, but returned both, ostensibly out of concern that the language accompanying the checks could have been construed as a settlement of her claims. (Doc. No. 76 ¶¶ 5–8.) To the extent it has not done so already, Aetna should re-mail one of those checks – or cut a new one – to Plaintiff forthwith.

from this Court. *See Caunitz*, 2016 WL 6956631, at *3–4 (dismissing a claim for reimbursement where the administrator's decision was correct).

### C. Medical Necessity

Finally, the parties engage in lengthy arguments about whether Effexor was approved as "medically necessary" and thus should have been reimbursed after Plaintiff met the out-of-pocket limit. (*See e.g.*, Pl. Mem. at 12; Def. Mem. at 9–10.) To be sure, prior to remand, the Court observed that "this dispute basically boils down to whether and which of Plaintiff's 2015 Effexor purchases were approved as medically necessary." (Op. at 9.) But as clarified on remand, Aetna's decision to deny benefits was not based on the lack of medical necessity, but on Plaintiff's failure to meet the family out-of-pocket limit. (Reexam. at 3.) Since there is no dispute that Plaintiff's expenditures did not exceed the out-of-pocket limit for her family plan in 2015, the Court need not decide whether Aetna approved Effexor as medically necessary in 2015.

### IV. CONCLUSION

For the reasons stated above, the Court concludes that Aetna's remand decision was not arbitrary and capricious insofar as it concluded that (1) Plaintiff's family's total medical expenses did not exceed the family plan's out-of-pocket limit for 2015 and (2) Plaintiff is entitled to $64.32 in reimbursement representing the copay differential for May–December 2015. Accordingly, Plaintiff's motion for summary judgment is DENIED and Aetna's cross-motion for summary judgment is GRANTED.

Nevertheless, this outcome does not preclude Plaintiff from seeking an award for attorneys' fees pursuant to Section 502(g) of ERISA – since Plaintiff prevailed on her first motion for summary judgment when this Court found that Aetna's initial denial of benefits was arbitrary and capricious. (Op. at 12). *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir. 1995) (holding that a court "may . . . determine that [Plaintiff] is the prevailing party to the extent that

her motion for summary judgment claimed that . . . [the plan administrator's] denial [of benefits] was arbitrary and capricious."). Moreover, Section 502(g) grants a court discretion to award reasonable attorneys' fees to "either party." 29 U.S.C. § 1132(g)(1). Accordingly, pursuant to the Court's March 28, 2018 Order (Doc. No. 52), IT IS HEREBY ORDERED THAT, should Plaintiff wish to renew its motion for attorney's fees, it must do so by April 30, 2019.

Finally, because neither party has addressed how Aetna's remand determination and this Court's summary judgment ruling affect Plaintiff's class action claims, IT IS FURTHER ORDERED THAT, by April 30, 2019, the parties shall submit a joint letter, not to exceed five pages, addressing this topic.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 54 and 60.

SO ORDERED.

Dated:     March 31, 2019
           New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation