UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACQUELINE FISHER,

                Plaintiff,

   -v-

AETNA LIFE INSURANCE COMPANY,

                Defendant.

No. 16-cv-144 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, Circuit Judge:

      Pending before the Court are two motions submitted by Plaintiff Jacqueline Fisher.  First, Fisher moves for reconsideration of the Court's March 31, 2019 order granting summary judgment in favor of Aetna (Doc. No. 77 (the "Order")), arguing that (i) the Court failed to interpret a relevant statutory provision in the Patient Protection and Affordable Care Act (the "Affordable Care Act" or the "Act"), 42 U.S.C. § 18022(c), in determining which out-of-pocket limit applied to Fisher under her health insurance policy and (ii) she is entitled to a judgment against Aetna for a copay differential of $64.32.  (Doc. Nos. 78–79.)  Fisher also moves for attorney's fees totaling $111,326.70 and $400 in costs.  (Doc. Nos. 80–82.)  Defendant Aetna Life Insurance Company opposes both motions.  (Doc. Nos. 85–86.)  For the reasons set forth below, Fisher's motion for reconsideration is DENIED, and her motion for attorney's fees and costs is GRANTED IN PART.

## I.  BACKGROUND AND PROCEDURAL HISTORY

      The Court presumes the parties' familiarity with the underlying facts and procedural history of this case, which are set forth in the Court's prior orders (Doc. Nos. 36, 77), and offers only a short summary of each for purposes of this opinion and order.[1]

---

[1] In deciding these motions, the Court has considered Fisher's memoranda of law in support of her motions (Doc. Nos. 79, 81), Aetna's memoranda of law in opposition to Fisher's motions (Doc. Nos. 85–86), Fisher's replies (Doc.

Fisher receives health insurance through her husband's law firm, which, on January 1, 2015, enrolled in a group health plan administered by Aetna (the "Policy"). (Order at 1.) The Policy provides for a three-tiered cost-sharing system. (*Id.* at 2.) Initially, enrollees must pay for all their medical expenses until their payments for covered services reach an annual deductible amount, which, in this case, was $4,000. (*Id.*) At that point, Aetna will begin to reimburse participants for some of their medical expenses. (*Id.*) But until the participant has met an annual out-of-pocket spending limit, Aetna will pay only the difference between the cost of covered services and an associated copayment – the "copay differential."[2] (*Id.*) Once that out-of-pocket limit is hit, however, Aetna will pay for 100% of the allowed amount for covered services for the remainder of the plan year. (*Id.*) Under the Policy, covered services include only those services deemed "medically necessary" by Aetna. (*Id.* (internal quotation marks omitted).)

Over the course of 2015, Fisher made monthly purchases of Effexor®, a brand name anti-depressant. (*Id.* at 3.) Typically, Policy participants are responsible for paying for the additional cost of "higher tier" brand name drugs, like Effexor, when a chemically equivalent generic drug is available. (*Id.* at 2.) But there is an exception to this requirement when a doctor certifies that the higher tier drug is medically necessary. (Doc. No. 36 at 2.)

Fisher disputed several of Aetna's benefits determinations concerning her Effexor purchases, which she asserted were medically necessary. First, Fisher claimed that she met her deductible amount in May 2015, meaning that Aetna was required to pay her the differential between a generic equivalent of Effexor and the generic copayment for Effexor prescriptions filled

Nos. 87–88), and the declarations of William Dunnegan (Doc. Nos. 82, 89). The Court has also considered its prior orders and the documents cited therein.

[2] The parties disputed whether the limit applicable to Fisher – an individual enrolled in the Policy through a family plan – was the limit that applies to individual plans (also called "self-only" plans) or the higher limit that applies to family plans. In awarding summary judgment to Aetna, the Court determined that it was the latter. (Order at 8–11.)

after that date.  (Order at 4–5.)  Second, she argued that Aetna was required to reimburse the full

cost of her prescriptions filled between September 28, 2015 and the end of the plan year, because,

by that time, she had met the individual out-of-pocket limit for the Policy.  (*Id.* at 5.)

In March 2017, the Court concluded that Aetna's denial of these benefits was arbitrary and

capricious and remanded the matter to Aetna for further consideration.  (Doc. No. 36 at 9–12.)  On

remand, Aetna made the following decisions:

> First, Aetna determined that it correctly assessed [Fisher] the
> additional charge (the difference between the cost of the higher tier
> [brand name] drug and the lower-tier [generic] drug) for her
> February–December 2015 Effexor purchases and correctly required
> her to make the copayment associated with Effexor's lower-tier
> generic equivalent.  Second, Aetna concluded that [Fisher's] out-of-
> pocket limit was the amount applicable to her family plan, rather
> than an individual plan under the Policy.  Third, the company
> adhered to its decision that the additional charges associated with
> [Fisher's] Effexor prescriptions should not be applied to her out-of-
> pocket limit.  Finally, Aetna reversed its decision not to reimburse
> [Fisher] for the copay differential – here, the difference between the
> cost of the generic drug ($18.04 per month) and the copayment
> associated with that drug ($10 per month), totaling $8.04 a month.
> . . . [As a result, Aetna] . . . issued reimbursement in the amount of
> $64.32 . . . .

(Order at 5–6 (internal quotation marks, citations, and alterations omitted).)

Not satisfied with this outcome, Fisher again sought recourse before the Court.  As before,

she argued that her prescription for Effexor was medically necessary and that she was entitled to

all amounts she spent on her prescription in excess of the Policy's individual out-of-pocket limit.

(*Id.* at 6.)  She also argued that even though Aetna agreed to pay her the $64.32 copay differential,

she was entitled to a judgment to that effect.  (*Id.*)  The Court disagreed and entered summary

judgment against Fisher on both claims.  (*Id.* at 13–14.)

Fisher now moves for reconsideration of that decision.  (Doc. No. 78.)  In addition, Fisher

requests attorney's fees under the Employee Retirement Income Security Act of 1974 ("ERISA"),

29 U.S.C. § 1132(g).  (Doc. No. 80.)  Aetna opposes both requests.  As to Fisher's motion for

reconsideration, Aetna argues that Fisher is merely looking for a second bite at the apple and has

not identified any material errors in the Order.  (Doc. No. 85 at 3–5.)[3]  And as for Fisher's request

for attorney's fees, Aetna argues primarily that fees are not warranted because any success that

Fisher experienced in this case was purely procedural.  (Doc. No. 86 at 7–9.)

## II.   DISCUSSION

### A.        Motion for Reconsideration

#### 1.        Legal Standard

To succeed on her motion for reconsideration, Fisher must identify "an intervening change

of controlling law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice." *Kolol Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d

99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245,

1255 (2d Cir. 1992)).  Put differently, a request for reconsideration "will generally be denied unless

the moving party can point to controlling decisions or data that the court overlooked – matters, in

other words, that might reasonably be expected to alter the conclusion reached by the court."

*Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also FR 8 Sing. Pte. Ltd. v. Albacore*

*Mar. Inc.*, 794 F. Supp. 2d 449, 451 (S.D.N.Y. 2011).

#### 2.        Out-of-Pocket Limit

Fisher moves for reconsideration of the Court's determination that she was required to meet

the Policy's family out-of-pocket limit ($12,000) rather than the individual out-of-pocket limit

($6,000) before Aetna was obligated to pay for 100% of the allowed amount for covered services

---

[3] The internal pagination of certain filings differs from the page numbers provided by ECF – for instance, the ECF page count includes the cover page and index from a memorandum of law whereas the memorandum itself will not. Where a difference between them exists, the page numbers referenced herein correspond to the cited filing's own pagination rather than the numbering assigned by ECF.

for the remainder of the plan year.  The thrust of her argument is that the Court, in holding that the Policy's plain language required Fisher to meet the higher family out-of-pocket limit, failed to consider whether that reading was permitted by the Affordable Care Act's provision governing group health plan cost sharing, found at 42 U.S.C. § 18022(c).  (Doc. No. 79 at 1–4.)  According to Fisher, the statutory text, along with a final agency rule that she says "clarifi[ed] the meaning of [the otherwise] ambiguous statute," support her position that Aetna could not require her to spend beyond the individual out-of-pocket limit.[4]  (*Id.* at 2.)  But the Court already considered (and rejected) these arguments.

As Fisher suggests, the Act sets limits on consumer out-of-pocket spending on in-network essential health benefits covered under most health plans – what the statute calls annual limits on cost sharing.[5]  *See* 42 U.S.C. § 18022(c).  While the Act does not set a dollar value for the applicable cost-sharing limit for a given year – as the amount is indexed to the rate of medical inflation, *id.* § 18022(c)(4) – it does provide that a family policy's out-of-pocket limit should be twice the amount of an individual policy's out-of-pocket limit:

> In the case of any plan year beginning in a calendar year after 2014, the limitation under this paragraph shall –
>
> **(i)**    in the case of self-only coverage, be equal to the dollar amount under subparagraph (A) for self-only coverage for plan years beginning in 2014, increased by an amount equal to the product of that amount and the premium adjustment percentage under paragraph (4) for the calendar year; and
>
> **(ii)**   in the case of other coverage, twice the amount in effect under clause (i).

---

[4] Fisher does not ask the Court to reconsider its interpretation of the Policy's language.  (Doc. No. 79 at 1 ("Fisher is not moving for reconsideration of the Order on that basis.").)

[5] Cost sharing includes "deductibles, coinsurance, copayments, or similar charges[,] and . . . any other expenditures required of an insured individual which is a qualified medical expense . . . with respect to essential health benefits covered under the plan."  42 U.S.C. § 18022(c)(3)(A).

> If the amount of any increase under clause (i) is not a multiple of $50, such increase shall be rounded to the next lowest multiple of $50.

*Id.* § 18022(c)(1)(B).  Beyond this requirement, however, the Act provides no direction about *which* limit – individual or family – applies to an individual covered by a family policy.  The applicable regulations were equally silent on the topic.  *See generally* 45 C.F.R. § 156.130.

That is, until 2015, when the U.S. Department of Health and Human Services ("HHS") passed a final rule concerning benefit and payment parameters for health insurance plans in 2016.  *See Patient Protection & Affordable Care Act; HHS Notice of Benefit & Payment Parameters for 2016*, 80 Fed. Reg. 10,750 (Feb. 27, 2015) (the "2015 Rule").  Buried in the rule's lengthy preamble was an important development:  HHS decided that for non-grandfathered group health plans, beginning in 2016, "[t]he annual limitation on cost sharing for self-only coverage [would] appl[y] to all individuals regardless of whether the individual is covered by a self-only plan or is covered by a plan that is other than self-only."[6]  *Id.* at 10,824–25.  In other words, HHS determined that insurance providers could not require any individual, including those with family coverage, to spend more than the individual out-of-pocket limit established under the Act – a limitation commonly referred to as an "embedded individual out-of-pocket limit" or "embedded cost sharing."

Fisher's argument that the Court failed to interpret the Act's cost-sharing provision depends on whether the 2015 Rule can be retroactively applied.[7]  That issue, in turn, hinges on whether the 2015 Rule was a legislative or an interpretive rule.

---

[6] Interestingly, this determination is found only in the preamble to the final rule; it has not been included in the regulation itself.  *See generally* 45 C.F.R. § 156.130.

[7] As explained below, if the 2015 Rule cannot be applied retroactively by courts, it is because the rule created new obligations that cannot be found in the text of the Act itself.

"The distinction between legislative and interpretive rules derives from the Administrative Procedure Act." *Sweet v. Sheahan*, 235 F.3d 80, 90 (2d Cir. 2000). While there are no statutory definitions for those two categories, this Circuit distinguishes between them based on whether the rule is creating new law or merely explaining existing law:

> [W]e have stated that legislative rules are those that create new law, rights, or duties, in what amounts to a legislative act. Interpretive rules, on the other hand, do not create rights, but merely clarify an existing statute or regulation.

*Id.* at 91 (internal quotation marks and citations omitted).

Whether a rule is legislative or interpretive can have numerous consequences; perhaps chief among them is whether the rule can be given retroactive effect. Generally speaking, "[r]etroactivity is not favored in the law." *City of New York v. Permanent Mission of India to the United Nations*, 618 F.3d 172, 192 (2d Cir. 2010) (quoting *Sweet*, 235 F.3d at 89); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988). The reason being, it "presents problems of unfairness" by upending "legitimate expectations and upset[ting] settled transactions." *Rock of Ages Corp. v. Sec'y of Lab.*, 170 F.3d 148, 158 (2d Cir. 1999) (internal quotation marks omitted). And while those concerns are particularly acute when dealing with legislative rules, they are rarely implicated by interpretive rules, which merely "crystallize" existing law or explain the meaning of an ambiguous statute. *Blake v. Carbone*, 489 F.3d 88, 98–99 (2d Cir. 2007); *see also Barenboim v. Starbucks Corp.*, 698 F.3d 104, 113 (2d Cir. 2012) (suggesting that a distinction exists between legislative and interpretive rules for purposes of retroactivity because an interpretive rule merely "clarif[ies] the meaning of an ambiguous statute"); *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 87 n.16 (2d Cir. 2006); *Sweet*, 235 F.3d at 88–90.

In this case, the 2015 Rule's pronouncement on embedded cost sharing was a legislative rule, which imposed new restrictions on market participants that cannot be found in the text of the

Act.  Of course, the rule itself declares that this change was merely a "clarification."  80 Fed. Reg. at 10,824.  And, admittedly, courts often defer to an agency's views on whether its rules are legislative or interpretive.  *See Huberman v. Perales*, 884 F.2d 62, 68 (2d Cir. 1989); *see also Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993) ("[W]e will defer to an agency's expressed intent that a regulation is clarifying unless the prior interpretation of the regulation or statute in question is patently inconsistent with the later one."), *overruled on other grounds*, *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).  But an agency's classification is not definitive.  *See New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 526 n.24 (S.D.N.Y. 2019).  This case presents a good example for why that is so.

First, the 2015 Rule appears to have "change[d] the law."  *Blake*, 489 F.3d at 98.  As noted above, other than to indicate that the family out-of-pocket limit may be twice that of the individual out-of-pocket limit, the Act is completely silent on which of the two limits should apply to an individual covered by a family plan.  *See* 42 U.S.C. § 18022(c)(1)(B).  "The extent and nature of the ambiguities" in the Act on this topic thus suggest "that the statute itself does not create [embedded cost-sharing requirements] and reinforce the conclusion that the [2015 Rule is] legislative."  *See Sweet*, 235 F.3d at 92; *see also Chamber of Com. v. OSHA*, 636 F.2d 464, 469 (D.C. Cir. 1980) ("Congress has not legislated and indicated its will on th[is] question . . . , therefore the Administration must have done more than exercise its power to fill up the details." (internal quotation marks omitted)).  Not surprisingly, then, before this rule was issued, insurers often required individuals to meet the family out-of-pocket limit – in fact, that was a feature of many high deductible plans with a health savings account.  *See* 80 Fed. Reg. at 10,824–25 (acknowledging that this "clarification" would effectively alter the types of health insurance policies that insurers are permitted to offer).  And, tellingly, Fisher has not identified a single

instance before the 2015 Rule was released in which the Act's cost-sharing provision was interpreted by a federal agency or a court to demand embedded cost sharing.

Second, HHS's own actions, and the actions of the other agencies tasked with implementing the Act, support the conclusion that the 2015 Rule was legislative. For starters, the rule was passed through the notice-and-comment process, *compare Patient Protection & Affordable Care Act; HHS Notice of Benefits & Payment Parameters for 2016*, 79 Fed. Reg. 70,674, 70,723 (Nov. 26, 2014), *with* 80 Fed. Reg. at 10,824–25, which is not typical for purely interpretive rules, *see Sweet*, 235 F.3d at 92–93 ("Had the agencies been engaged in interpretive rulemaking, they would have been exempt from the notice-and-comment provisions."); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (noting that interpretive rules often do not go through the typical notice-and-comment process). Next, HHS provided for the rule to be enforced only prospectively, *see* 80 Fed. Reg. at 10,825, suggesting that the agency saw the rule as changing the existing legal landscape and requiring a phase-in period to allow market participants time to reorient their relationships, *cf. Sweet*, 235 F.3d at 92 (acknowledging that when Congress requires a delay between the time regulations are promulgated and when they become effective, it is because Congress "anticipate[s] that the agenc[y] w[ill] institute new legal obligations – that the agenc[y] w[ill] engage in legislative rulemaking"). As Judge Woods recently observed in a similar dispute between Fisher and Aetna, "[i]f [HHS] believed that the text of the [Act] required the 2015 Rule's interpretation, they likely would have said so." *Fisher v. Aetna Life Ins. Co.*, No. 15-cv-283 (GHW), 2020 WL 4700935, at *7 (S.D.N.Y. Aug. 12, 2020). Lastly, in explaining why it was issuing this rule, HHS presented the change as a policy choice, driven primarily by a desire to increase consumer protections. *See* 80 Fed. Reg. at 10,825–26 ("We believe that this clarification is an important consumer protection . . . ."). But

policy decisions are typically the product of legislative action. *See Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 143 (2d Cir. 1994); *Chamber of Com.*, 636 F.2d at 469 ("By making this determination, the Administration provided the policy decision Congress omitted" and thereby "has attempted through this regulation to supplement the [statute], not simply to construe it . . . .").

So, despite HHS's use of the term "clarification," the 2015 Rule was clearly an exercise in legislative rulemaking. And because the rule was legislative, it should not be given retroactive effect (as a tool for interpreting the text of the Act or otherwise) – especially since HHS itself provided for the rule to be applied only prospectively. *See Yale-New Haven Hosp.*, 470 F.3d at 87 n.16; *Sweet*, 235 F.3d at 86, 88–89 (noting that the effective date of a legislative rule is "entitled to substantial deference"); *accord Rock of Ages*, 170 F.3d at 158.

For this reason, Fisher is wrong about the Court having failed to apply section 18022(c) of the Act when the Court initially interpreted the Policy's cost sharing requirements. Specifically, the Court's previous holding that the 2015 Rule cannot be given retroactive effect makes sense only if one recognizes that the Act's text does not govern the issue – that is, that the 2015 Rule imposed obligations that were not found in the Act itself. In short, the Court's original decision considered and rejected Fisher's argument that the Act's text mandated embedded cost sharing. (*See* Order at 10–11.)

The Court thus reaffirms its prior decision that neither the Act, the applicable regulations, nor the 2015 Rule support Fisher's argument. Accordingly, the plain text of the Policy controls this issue, under which Fisher was obligated to meet the family out-of-pocket limit before Aetna's full reimbursement obligations were triggered. (*Id.* at 8–10.)

### 3.    Copay Differential

Fisher next asks the Court to reconsider its decision not to award her a judgment against Aetna for the $64.32 copay differential. (Doc. No. 79 at 4–6.) In so doing, Fisher relies on

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016), to support the proposition that "an unaccepted settlement offer has no force." But Fisher's argument is misplaced.

The check that Aetna sent to Fisher was not an "unaccepted settlement offer." *Id.* Rather, it was a formal decision by Aetna, as plan administrator, that it would pay Fisher her copay differential of $64.32 under the Policy. (Order at 12.) So there is simply no basis for the Court to issue a judgment in Fisher's favor. (*See id.* at 11–13.).

*     *     *

Accordingly, the Court reaffirms its prior Order and denies Fisher's motion for reconsideration in its entirety.

## B.        Fisher's Entitlement to Attorney's Fees and Costs

### 1.        Applicable Law

"The general rule in our legal system is that each party must pay its own attorney's fees and expenses," *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010), "unless a statute or contract provides otherwise," *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010). ERISA is one such statute that provides otherwise; it grants courts "discretion" to award fees and costs "to either party." *Id.* at 244 (quoting 29 U.S.C. § 1132(g)(1)). That discretion, however, "is not unlimited." *Donachie v. Liberty Life Assur. Co.*, 745 F.3d 41, 46 (2d Cir. 2014) (quoting *Hardt*, 560 U.S. at 254–55).

As the Supreme Court has cautioned, a court may award fees and costs to a litigant only if she has achieved "some degree of success on the merits." *Hardt*, 560 U.S. at 255 (quoting 29 U.S.C. § 1132(g)(1)). But other than note that a "trivial success" or a "purely procedural victory" is insufficient, *id.* at 255 (internal quotation marks and alterations omitted), the Supreme Court has not elaborated on what a party must achieve to meet this standard, *see Scarangella v. Grp. Health, Inc.*, 731 F.3d 146, 152 (2d Cir. 2013). And while the Second Circuit has provided additional

11

guidance over the years, there is still no definitive answer on "whether a remand order, without more, constitutes 'some success on the merits.'"[8]  *Hardt*, 560 U.S. at 256.

That said, a parade of district courts within this Circuit have concluded that a so called "remand simpliciter" – a remand to the plan administrator without more – is enough to constitute some degree of success on the merits under *Hardt*.  *See Dimopoulou v. First Unum Life Ins. Co.*, No. 13-cv-7159 (ALC), 2017 WL 464430, at *1–2 (S.D.N.Y. Feb. 3, 2017); *Valentine v. Aetna Life Ins. Co.*, No. 14-cv-1752 (JFB), 2016 WL 4544036, at *4–5 (E.D.N.Y. Aug. 31, 2016) (Bianco, *J.*) (collecting cases); *Wallace v. Grp. Long Term Disability Plan for Emps. of TDAmeritrade Holding Corp.*, No. 13-cv-6759 (LGS), 2015 WL 4750763, at *6 (S.D.N.Y. Aug. 11, 2015).[9]  Many of these cases find support in the First Circuit's reasoning that there are "two positive outcomes inherent in [a remand] order:  (1) a finding that the administrative assessment of the claim was in some way deficient, and (2) the plaintiff's renewed opportunity to obtain benefits or compensation."  *Gross v. Sun Life Assur. Co. of Can.*, 763 F.3d 73, 78 (1st Cir. 2014). The Court finds these cases persuasive and agrees that a "remand simpliciter" is enough to constitute "some degree of success on the merits" under *Hardt*.

---

[8] The Second Circuit has said, however, that "a remand order opining positively on the merits of the plaintiff's claim [is] sufficient" to constitute some success on the merits.  *Scarangella*, 731 F.3d at 155.  But the Court has never held that such positive guidance favoring an award of benefits on remand, or an actual grant of benefits, is necessary to meet *Hardt*'s standard.

[9] *See also Hughes v. Hartford Life & Accident Ins. Co.*, No. 17-cv-1561 (JAM), 2020 WL 563364, at *1–2 (D. Conn. Feb. 5, 2020); *Easter v. Cayuga Med. Ctr. at Ithaca Prepaid Health Plan*, No. 14-cv-1403 (BKS), 2017 WL 3267922, at *2 (N.D.N.Y July 31, 2017); *Benjamin v. Oxford Health Ins., Inc.*, No. 16-cv-408 (CSH), 2018 WL 3489588, at *10–11 (D. Conn. July 19, 2018); *Schuman v. Aetna Life Ins. Co.*, No. 15-cv-1006 (SRU), 2017 WL 2662191, at *4–5 (D. Conn. June 20, 2017); *Dwinnell v. Fed. Express Long Term Disability Plan*, No. 14-cv-1439 (JAM), 2017 WL 1371254, at *1–2 (D. Conn. Apr. 14, 2017); *Standish v. Fed. Express Corp. Long Term, Disability Plan*, No. 15-cv-6226 (MAT), 2017 WL 874689, at *2 (W.D.N.Y. Mar. 6, 2017); *Delprado v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 12-cv-673 (BKS), 2015 WL 1780883, at *41 (N.D.N.Y. Apr. 20, 2015); *Strope v. Unum Provident Corp.*, No. 06-cv-628 (JTC), 2010 WL 4451548, at *2 (W.D.N.Y. Nov. 4, 2010); *Palmiotti v. Metro. Life Ins. Co.*, No. 04-cv-718 (LTS), 2006 WL 1637083, at *1 (S.D.N.Y. June 9, 2006); *Cook v. N.Y. Times Co. Long-Term Disability Plan*, No. 02-cv-9154 (GEL), 2004 WL 203111, at *20 (S.D.N.Y. Jan. 30, 2004) (Lynch, *J.*).

"After *Hardt*, whether a plaintiff has obtained some degree of success on the merits is the sole factor that a court *must* consider in exercising its discretion" to award fees under section 1332(g)(1). *Donachie*, 745 F.3d at 46. In other words, so long as a party has met this standard, a court has full discretion to award fees "without further inquiry." *Id.*; *but see Toussaint v. JJ Weiser, Inc.*, 648 F.3d 108, 110 (2d Cir. 2011) (noting that a court is not *required* to award fees simply because the claimant achieved some success on the merits). But courts are permitted to look to "five [additional] factors" as a means of channeling their discretion. *Donachie*, 745 F.3d at 46; *see also Toussaint*, 648 F.3d at 110. Those five factors, termed the *Chambless* factors, are:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987), *abrogated in part by Hardt*, 560 U.S. 242 (2010); *see also Hardt*, 560 U.S. at 249 n.1 (invoking the Fourth Circuit's incarnation of this five-factor test, which is substantively identical to the *Chambless* test). While none of these factors is dispositive, the degree of culpability and relative merits of the parties' positions "do 'weigh heavily.'" *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 48 (2d Cir. 2009) (quoting *Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund*, 902 F.2d 185, 189 (2d Cir. 1990)); *see also Stolarz v. Rosen*, 03-cv-3083 (DF), 2009 WL 691206, at *2 (S.D.N.Y. Mar. 22, 2009) ("The party seeking an award of attorneys' fees need not establish all five [factors] and no one factor is dispositive." (internal quotation marks omitted)).

## 2.      Fisher Is Entitled to an Award of Attorney's Fees and Costs

Although Aetna contends that Fisher has not achieved success on the merits because she has not "obtained any of the relief sought in her complaint," (Doc. No. 86 at 8–9), the Court agrees

with Fisher that the "remand simpliciter" granted here – which required Aetna to reassess its denial of benefits – constituted a sufficient degree of success on the merits to justify a fee award under *Hardt*, *see Valentine*, 2016 WL 4544036, at *4–5; *Wallace*, 2015 WL 4750763, at *6.  Moreover, a careful consideration of the *Chambless* factors supports a finding that Fisher is entitled to some (but not all) of the fees and costs that she seeks.

First, Aetna acted culpably.  "[T]he concepts of 'bad faith' and 'culpability' are distinct, and either one may satisfy the first *Chambless* factor."  *Donachie*, 745 F.3d at 47.  "[A] finding of culpability involves more than mere negligence, but does not require malice or an ulterior motive."  *Cohen v. Metro. Life Ins. Co.*, No. 00-cv-6112 (LTS), 2007 WL 4208979, at *2 (S.D.N.Y. Nov. 21, 2007), *aff'd in part*, 334 F. App'x 375 (2d Cir. 2009).  Notably, an arbitrary and capricious denial of benefits "suffices to show [the plan administrator's] culpability."  *Demonchaux v. Unitedhealthcare Oxford*, No. 10-cv-4491 (DAB), 2014 WL 1273772, at *4 (S.D.N.Y. Mar. 27, 2014); *see also Valentine*, 2016 WL 4544036, at *5 (holding that "a finding that the administrator's review of the claim was arbitrary and capricious is sufficiently culpable to weigh in favor of granting attorney's fees"); *Levitian v. Sun Life & Health Ins. Co. (U.S.)*, No. 09-cv-2965 (GBD), 2013 WL 4399026, at *2 (S.D.N.Y. Aug. 15, 2013); *Palmiotti*, 2006 WL 1637083, at *1.  That alone would seem to resolve this factor in Fisher's favor.

But more than that, Aetna's decision to "resist[]" paying Fisher the copay differential for years "demonstrated more than mere negligence."  *Pierorazio v. Thalle Const. Co.*, No. 13-cv-4500 (VB), 2014 WL 3887185, at *4 (S.D.N.Y. June 26, 2014).  This was a simple accounting issue that Fisher first raised to Aetna in October 2015.  (Doc. No. 36 at 3.)  Rather than correct the issue at that time, Aetna continued to refuse to pay the copay differential to Fisher until after the Court's remand order.  It was only then, in April 2018, that Aetna finally granted Fisher the

"precise relief [she] requested in her complaint." (Doc. No. 85 at 1.) Of course, Aetna says that Fisher met the deductible amount only as a result of Aetna's own accounting error in Fisher's favor. (Order at 11.) Nevertheless, by refusing either to correct the error or accept its consequences for nearly three years, Aetna caused the parties (and the Court) to waste significant resources litigating this issue.

Second, there is no dispute that Aetna has the ability the pay an award. (Doc. No. 81 at 6; Doc. No. 86 at 11.) While a party's ability to pay – unlike an *inability* to pay – "generally is neutral in effect," *Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07-cv-9661 (GEL), 2009 WL 890626, at *2 (S.D.N.Y. Apr. 2, 2009), "[a]t the very least, the ability to pay factor does not weigh in [Aetna's] favor," *Demonchaux*, 2014 WL 1273772, at *5.

Third, the deterrence factor slightly favors awarding fees. Importantly, this factor "is not meant to deter plan administrators from repeating specific, wrongful conduct," but rather "to deter [them] from engaging in generically culpable conduct." *Anderson v. Sotheby's, Inc.*, No. 04-cv-8180 (SAS), 2006 WL 2637535, at *4 (S.D.N.Y. Sept. 11, 2006). In this case, that primarily means deterring plan administrators from arbitrarily and capriciously denying claims in the future. Such a laudatory goal is enough to tip this factor in Fisher's favor. *See, e.g.*, *Valentine*, 2016 WL 4544036, at *6; *Demonchaux*, 2014 WL 1273772, at *5 (reasoning that fees were warranted to "deter administrators from making arbitrary and capricious benefits denials," among other things); *Sansevera v. E.I. DuPont de Nemours & Co.*, 859 F. Supp. 106, 117, (S.D.N.Y. 1994) ("An award of attorney's fees and costs is necessary . . . to deter other employers from similarly denying an applicant a fair consideration of his or her claim.").

Fourth, although the merits of Fisher's claims, which are "closely related" to Aetna's culpability, *Demonchaux*, 2014 WL 1273772, at *5 (internal quotation marks omitted), are

something of a mixed bag, the record is clear that Fisher at least succeeded in forcing Aetna to provide a revised justification for its decision to deny her ERISA benefits, *id.*; *Rappa v. Conn. Gen. Life Ins. Co.*, No. cv-03-5286 (CBA) (JMA), 2005 WL 6244543, at *2 (E.D.N.Y. June 28, 2005) (noting that a remand order demonstrates "that plaintiff's position had merit and defendants' did not"). The fact that Aetna ultimately awarded Fisher the copay differential on remand further suggests that her claim had at least some degree of substance to it. On the other hand, it must be acknowledged that the copay differential – a mere $64.32 in total – was only a small portion of the relief sought by Fisher, and that Fisher did not succeed on the bulk of her claims, which alleged (incorrectly) that Aetna had wrongfully denied Fisher thousands of dollars in benefits payments (Doc. No. 21 at 7). And while Fisher was also able to at least secure a remand of Aetna's original benefits determination as arbitrary and capricious, it bears noting that she not only never requested that relief in her complaint (Doc. No. 1 at 5–8), but affirmatively argued that a remand was *inappropriate* (Doc. No. 27 at 2, 15–18). Ultimately, the Court is persuaded that this factor weighs in favor of awarding Fisher fees, but the limited nature of her success counsels against awarding Fisher the entirety of what she seeks. *See Verdier v. Thalle Constr. Co.*, No. 14-cv-04436 (NSR), 2018 WL 1136615, at *3 (S.D.N.Y. Mar. 1, 2018) ("When a plaintiff achieves only partial or limited success, full compensation for attorneys' fees may not be reasonable. Under such circumstances, courts are permitted to reduce the award to account for the limited success." (internal quotation marks and citations omitted)), *aff'd*, 771 F. App'x 20 (2d Cir. 2019); *Sheehan v. Metro. Life Ins. Co.*, 450 F. Supp. 2d 321, 329 (S.D.N.Y. 2006) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).

Fifth, although Fisher seeks to turn this dispute into a class action suit that could theoretically benefit other Plan participants, the Court finds that the final *Chambless* factor has not

been met.  Simply put, Fisher's claims pertain solely to herself.  Her complaint does not include claims from other parties (*see generally* Doc. No. 1), and while Fisher points to a letter from Aetna stating that her lawsuit caused Aetna to "fix[] [an] error in [its] system to avoid a future issue," (Doc. No. 89 at 2 (internal quotation marks and emphasis omitted)), there is nothing in the record to suggest that Fisher's suit conferred a common benefit on a group of Plan participants.  Indeed, Fisher admits as much in her memorandum of law.  (Doc. No. 81 at 11 (acknowledging that "this action has not conferred a common benefit on a group of [P]lan participants").

*     *     *

In short, the facts of this case support an award of attorney's fees.  Accordingly, the Court will award partial fees and costs for the litigation to Fisher.

### 3.       Reasonableness of Fisher's Claimed Fees

Having determined that an award of attorney's fees is appropriate, the Court must assess whether the fees sought by Fisher are reasonable.  When calculating attorney's fees, courts in this Circuit determine a "presumptively reasonable fee" by multiplying a reasonable hourly rate by the reasonable number of hours expended on the case.  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 189–90 (2d Cir. 2008) (internal quotation marks omitted).  This analysis "boils down to [asking] what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively."  *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted).  "In making [this determination], the [Court] does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties."  *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 371 (S.D.N.Y. 2005).   "[T]he fee applicant bears the burden of . . . documenting the appropriate hours expended and hourly rates."  *Hensley*, 461 U.S. at 437.

17

Fisher requests $111,326.70 for the attorney hours expended in litigating her claims against Aetna and $400 for costs associated with filing this action.  (Doc. No. 81 at 12, 22.)  Fisher's lawyers – Dunnegan & Scileppi LLC – charged the following hourly rates for three of its attorneys: $450 per hour for William Dunnegan, a partner at the firm who graduated from Columbia Law School in 1980 (Doc. No. 81 at 16; Doc. No. 82 at 1–2); $225 per hour for Richard Weiss, an associate who graduated from New York University School of Law in 2012 and has been at the firm since December 2013 (Doc. No. 81 at 16; Doc. No. 82 at 3); and $165 per hour for Andrew Chung, an associate who graduated from Columbia Law School in 2016 and has worked at the firm since September 2016 (Doc. No. 81 at 16; Doc. No. 82 at 3).

Although Aetna did not challenge Dunnegan & Scileppi's rates (Doc. No. 86 at 13–16), courts in this district have generally found hourly rates of $400 to $750 reasonable for partners and rates of approximately $250 to $325 reasonable for associates, *see e.g.*, *Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, No. 14-cv-6911 (VEC) (JLC), 2016 WL 658310, at*9 (S.D.N.Y. Feb. 17, 2016), *adopted*, 2016 WL 1717215 (S.D.N.Y. Apr. 27, 2016) (approving an associate rate range from $247.50 to $324 per hour); *Source Vagabond Sys., Ltd. v. Hydrapak, Inc.*, No. 11-cv-5379 (CM) (JLC), 2013 WL 136180, at *10 (S.D.N.Y. Jan. 11, 2013) (setting reasonable rates for partners at $725 per hour and associates at $430 per hour), *adopted in part and rejected in part*, 2013 WL 634510 (S.D.N.Y. Feb. 21, 2013), *aff'd*, 753 F.3d 1291 (Fed. Cir. 2014); *Union of Orthodox Jewish Congregations of Am. v. Royal Food Distribs. LLC*, 665 F. Supp. 2d 434, 437 (S.D.N.Y. 2009) (setting partner rate at $735 per hour and associate rates between $275 to $445 per hour); *Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*, No. 04-cv-2983 (DLC) (KNF), 2006 WL 5804603, at *6–8 (S.D.N.Y. Dec. 11, 2006) (determining that partner rates between $490 to $540 per hour and an associate rate of $325 per hour were

reasonable), *adopted*, 2007 WL 656274 (S.D.N.Y. Feb. 23, 2007).  Consequently, the Court finds that the hourly rates charged by Dunnegan, Weiss, and Chung are well within the common ranges for attorney rates in this district and are thus reasonable.

Aetna asks the Court to deduct the number of hours Fisher's attorneys spent responding to the Court's order to show cause.  (Doc. No. 86 at 15; Doc. No. 31.)  Although the Court declined to sanction Fisher and her attorneys (Doc. No. 35), it would not have issued the order had Fisher's attorneys not created an "apparent inconsistency between [their] prior representations to this Court and to Judge Woods and the arguments they now raise on summary judgement in this action," (Doc. No. 31 at 2).  Clearly, Aetna should not be required to pay for the time and effort Fisher spent remedying her own mistakes.  *See Haifeng Xie v. Sakura Kai I Inc.*, No. 17-cv-7509 (ILG) (JO), 2020 U.S. Dist. LEXIS 45734, at \*8 n.6 (E.D.N.Y. Mar. 12, 2020) ("The defendants likewise should not be required to pay for the 3.55 hours the plaintiffs claim . . . for their counsel's work responding to this court's order to show cause."), *adopted*, 2020 WL 2569406 (E.D.N.Y. May 20, 2020); *Suarez Castaneda v. F&R Cleaning Servs. Corp.*, No. 17-cv-7603 (SJ) (PK), 2019 WL 5694118, at \*15 (E.D.N.Y. Mar. 15, 2019) (recommending that "the time spent responding to an order to show cause . . . should not be counted"), *adopted*, 2019 WL 5693768 (E.D.N.Y. July 8, 2019); *Weeks v. Colvin*, No. 13-cv-00232 (JCH), 2015 WL 3453358, at \*2 n.2 (D. Conn. May 28, 2015) (holding that it was not clearly erroneous for the magistrate judge to "decline[] to award fees for [time] spent reviewing the court's Order to Show Cause").  As a result, the Court will not award fees for the time spent addressing the order to show cause and reduces the number of hours accordingly.

Two additional reductions are warranted.  First, as addressed above, Fisher's limited success in this case merits a significant reduction in the fees that she can recover.  *See Levy v.*

*Young Adult Inst., Inc.*, No. 13-cv-2861 (JPO), 2019 WL 1434271, at *6 (S.D.N.Y. Mar. 30, 2019) (applying 35% haircut to fees sought due to limited success on the merits); *Tedesco v. IBEW Local 1249 Ins. Fund*, No. 14-cv-3367 (CS), 2019 WL 140649, at *11 (S.D.N.Y. Jan. 9, 2019) (applying a roughly 66% haircut); *Schuman*, 2017 WL 2662191, at *10 ("I conclude that Aetna's proposed 75 percent reduction in hours adequately – even generously – captures the proportion of work that Schuman's attorney's spent on his successful claim."); *Sheehan*, 450 F. Supp. 2d at 330 (applying a 30% haircut); *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 865 F. Supp. 2d 284, 296–97 (E.D.N.Y. 2012) (collecting cases where fees were reduced between 20% and 60% due to a lack of significant success on the merits); *Barrett v. Hartford Life & Acc. Ins. Co.*, No. 10-cv-4600 (AKH), 2012 WL 6929143, at *1 (S.D.N.Y. Nov. 9, 2012) ("I considered that the merits were mixed, and [concluded] that 40 percent was just compensation."). Weighing Fisher's limited success against the need to deter the culpable conduct that Aetna engaged in, the Court determines that a 75% reduction in fees is warranted. This strikes the proper balance between compensating Fisher for having had to bring this litigation as a result of Aetna's conduct, while recognizing that nearly all the relief that Fisher sought was ultimately denied by Aetna on remand and, eventually, the Court. And the bulk of the relief that Fisher did receive – a remand of Aetna's original benefits decision – was awarded against Fisher's express wishes. (Doc. No. 27 at 2, 15–18 (arguing that Aetna had a conflict of interest, which rendered a remand inappropriate).)

Second, many of Dunnegan & Scileppi's billing entries are particularly vague. For example, one entry seeks to recover for 1.3 hours of work that is cryptically summarized as having been spent "[m]eet[ing] with RW; review[ing] draft." (Doc. No. 82-1 at 5.) And another bills for 1.2 hours of work based only on the vague description: "Docs from RW; revisions." (*Id.* at 5.)

On top of that, numerous entries of five hours or more were kept using a "block billing" methodology.  (*E.g.*, *id.* at 6, 8, 11, 13, 16).  This is problematic as it impedes the Court's ability to "conduct a meaningful review of the hours requested."  *Montefiore Med. Ctr. v. Local 272 Welfare Fund*, No. 09-cv-3096 (RA), 2019 WL 4565099, at *10 (S.D.N.Y. Sept. 19, 2019) (internal quotation marks omitted); *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 53 (S.D.N.Y. 205) (explaining that "block billing is most problematic where large amounts of time (*e.g.*, five hours or more) are block billed").  Together, these issues merit a further reduction in Fisher's recovery.  *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (noting that courts may apply an across-the-board percentage cut "as a practical means of trimming fat from a fee application" (internal quotation marks omitted)); *Montefiore Med. Ctr.*, 2019 WL 4565099, at *10–11 (reducing fee award by 20% for vague charges, block-billed charges, and charges for clerking work); *Genger v. Genger*, No. 14-cv-5683 (KBF), 2015 WL 1011718, at *2 (S.D.N.Y. Mar. 9, 2015) (noting that "[a]cross-the-board reductions in the range of 15% to 30% are appropriate when block billing is employed"); *Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*, 549 F. Supp. 2d 274, 283–84 (E.D.N.Y. 2008) (applying an "across-the-board reduction of ten percent" where time entries included block billing and vague entries).  In this case, the Court determines that a further 10% reduction in fees is appropriate.

In all, Fisher requests fees totaling $111,326.70.  (Doc. No. 81 at 22; Doc. No. 82 at 1.) The Court will first reduce this amount by subtracting the hours spent responding to the Court's order to show cause – 20 hours by Dunnegan at $450 an hour (Doc. No. 82-1 at 8) and 9.5 hours

by Weiss at $225 per hour (*id.* at 15) – which reduces the amount to $100,189.20.  Reducing that

figure by 85% for the reasons discussed above results in recoverable fees of $15,028.38.[10]

Accordingly, the Court awards Fisher $15,428.38, consisting of $15,028.38 in attorney's

fees and $400 in costs.

### III.  CONCLUSION

For the reasons set forth above, while Fisher's motion for reconsideration is DENIED, the

Court GRANTS IN PART her motion for attorney's fees and costs and awards her $15,028.38 in

attorney's fees and $400 in costs.  The Clerk of Court is respectfully directed to terminate the

motions pending at document numbers 78 and 80.


SO ORDERED.

Dated:        October 5, 2020
              New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

---

[10] In reducing Fisher's requested fees by this amount, the Court is mindful that Fisher has already "voluntarily accept[ed] a 5% reduction in the lodestar."  (Doc. No. 81 at 16.)